# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHERRY FRANCES ABBOTT,

    Plaintiff,

v.

NANCY A. BERRYHILL,[1] Acting
Commissioner of Social Security,

    Defendant.

No. 16 C 1811

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Sherry Frances Abbott filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the Act). 42 U.S.C. §§ 405(g), 423 *et. seq.* The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a Motion for Summary Judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

---

[1] Nancy A. Berryhill, who became Acting Commissioner of Social Security on January 23, 2017, is substituted for her predecessor as the proper defendant in this action. Fed. R. Civ. P. 25(d).

# I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

"The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff, whose prior application for disability benefits was denied on March 9, 2011 (R. at 77–89), re-applied for SSI and DIB on October 4, 2012, alleging that she been disabled since March 23, 2011, due to a learning disability, depression, and suicidal thoughts. (*Id*. at 245–52, 318). The applications were denied initially and upon reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id*. at 118–119, 146–47). On July 21, 2014, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ), at which Psychological Expert Terry Shapiro, Ph.D., and Vocational Expert Thomas Dunleavy (the VE) also testified. The ALJ denied Plaintiff's request for benefits on July 21, 2014. (*Id*. at 12–21). As an initial matter, he noted that Plaintiff meets the insured status requirements of the Act through December 31, 2017. (*Id*. at 14). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since her alleged onset date of March 23, 2011. (*Id*.). At step two, the ALJ found that Plaintiff has the severe impairments of major depressive disorder, generalized anxiety disorder, and a cognitive impairment with borderline intellectual functioning. (*Id*. at 15). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id*. at 15–16).

The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC) and determined that Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple and repetitive tasks; can have only occasional interaction with the public in the work setting; and can have only occasional interaction with coworkers and supervisors. (R. at 16–20). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff cannot perform any past relevant work. (*Id.* at 20). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including housekeeper, laundry laborer, and transportation cleaner. (*Id.*at 21). Accordingly, the ALJ concluded that Plaintiff is not under a disability, as defined by the Act.

The Appeals Council denied Plaintiff's request for review on April 21, 2014. (R. at 1–6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in gen-

eral, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks eviden-

tiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. EVIDENCE AND TESTIMONY

Plaintiff completed high school in special education courses and most recently worked as a school crossing guard for two hours per day. (R. at 34–35, 580). Prior to the period at issue here, she had at least two psychiatric admissions to the hospital, in March 2010 and January 2011. (*Id*. at 99, 464).

A social worker who performed a mental health assessment of Plaintiff at the Kenneth W. Young Center (the Center) on June 2, 2011, noted that she "was not a very good historian" and "seemed to have an imperfect grasp of why she was here." (R. at 636). She had been referred to the Center by her primary care physician, who wanted a psychiatrist to take over the mental health portion of Plaintiff's medication management. (*Id*. at 638). On July 28, 2011, Plaintiff met with psychiatrist Jerry Gibbons, M.D., who took over management of her psychiatric care and met with Plaintiff approximately monthly thereafter. (*Id*. at 638, 640, 642–47, 650–51, 653–56, 660–61, 663–64, 673–74, 678–79, 684–85, 687, 751–52, 755–56, 759–60, 764–65, 767–68 ). Dr. Gibbons typically rated Plaintiff's perception as "normal" but her insight and judgment as "fair." (*Id*. at 640, 642, 644). Between July and October, Dr. Gibbons weaned Plaintiff off of Haldol, an antipsychotic drug she had been prescribed at the hospital, and switched her antidepressant medication due to an adverse side effect. (*Id*. at 638, 640, 642–45).

On October 28, 2011, Plaintiff was again hospitalized after presenting to the emergency room with suicidal ideations. Her stressors at the time were financial troubles and a change in medications. (R. at 413, 419). She remained in the hospital three nights, improved with group and individual therapy, and was discharged on October 31. (*Id.* at 403.) Afterwards, Dr. Gibbons continued her Cymbalta but in December, Plaintiff admitted to a counselor at the Center that she felt the medication was "not doing what it is supposed to do." (*Id.* at 646–51).

On January 24, 2012, Plaintiff was again admitted to the hospital due to thoughts of stabbing herself. (R. at 424). Psychiatrist Blaise Wolfrum, M.D., entered her room to perform a psychiatric evaluation and found Plaintiff "cowering in the corner of her room behind her desk, wrapped up with blankets." (*Id.* at 427.) Dr. Wolfrum noted that Plaintiff had depression, poor judgment and insight, and below average intelligence. Plaintiff reported that she was experiencing financial stress and reported a history of auditory hallucinations. (*Id.* at 424, 427, 442). Dr. Wolfrum assessed her then-current GAF score as 25,[3] with a highest past-year

---

[3] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev.2000) (hereinafter *DSM–IV* ). A GAF score of 25 indicates that "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g. stays in bed all day, no job, home or friends)." The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed.2013); *see Williams* v. *Colvin,* 757 F.3d 610, 613 (7th Cir.2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

range of 55–65.[4] (*Id.* at 427). On January 27, Plaintiff was discharged with a new prescription for Haldol. (*Id.* at 442).

On March 7, 2012, a police deputy called the Center with concerns about Plaintiff, stemming from "an incident . . . with a dog" which had occurred the previous day during her job as crossing guard. (R. at 652). She had admitted to having "thoughts" related to a friend's talk about killing herself. (*Id.*) Because of this incident, Plaintiff was again psychiatrically hospitalized later that same day. She related that she had suicidal thoughts triggered by two recent conversations in which people had mentioned suicide or spoke of self-harm. (*Id.* at 445, 447, 464.) Psychiatrist Mumtaz F. Raza, M.D., evaluated Plaintiff and noted that she had a history of mild to moderate mental retardation, as well as depression. (*Id.* at 448). In addition to the Cymbalta she was then taking, over the years she had tried other antidepressant medications including Effexor, Wellbutrin, and Lexapro, as well as the anti-anxiety medication Xanax and the sleep aid Ambien. (*Id.*). Dr. Raza assessed her GAF at 30. (*Id.*). Plaintiff was treated then released from the hospital on March 10. (*Id.* at 445–46).

Plaintiff continued to receive regular medication management from Dr. Gibbons and periodic assessment and treatment plans from counselors at the Center. (R. at 653–659). In a May 2012 assessment with a counselor, Plaintiff reported having no

---

[4] A GAF score of 51–60 corresponds with moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 34. A GAF score of 61–70 indicates that the person has some mild symptoms but generally functions well and has some meaningful interpersonal relationships. *Id.* at 34.

depressive symptoms. (*Id.* at 540). Nevertheless, on August 1, 2012,[5] Plaintiff was hospitalized after expressing suicidal and homicidal ideation. (*Id.* at 605, 608, 613). She indicated that she was suicidal because she was unable to support herself financially. (*Id.* at 613). She also had thoughts of killing her pastor and another friend at church because they urged her to get another job and be financially independent, and she "had enough of them saying it over and over again." (*Id.* at 613, 620). She was treated with therapy and an additional antidepressant and released on August 5. (*Id.* at 603–04).

As a result of that incident, on August 17, 2012, the Circuit Court of Cook County, Illinois, issued two Summons/Stalking No Contact Orders against Plaintiff prohibiting her from having any contact with her former pastor and the fellow parishioner and their families, and prohibiting her from being within 100 feet of her former church or the homes of the protected families. (R. at 284–93). Soon thereafter, her employer learned of the No Contact Orders and placed her on leave, then later fired her, from her position as a crossing guard. (*Id.* at 35, 42, 49–50, 673–676). A counselor at the Center who spoke with her on September 6, 2012 noted that Plaintiff was "not able to work due to her actions." (*Id.* at 672).

Plaintiff saw Dr. Gibbons for medication management in September and again in December 2012. (R. at 673–74, 678–79). On November 19, 2012, Plaintiff's outside therapist, Annemarie Husser, called the Center to discuss concerns she had

---

[5] The admission date of August 2, 2012 appearing elsewhere in the record reflects the fact that Plaintiff was admitted from the ER to inpatient care after midnight. (R. at 613).

about Plaintiff. (*Id.* at 680, 688). They discussed Plaintiff's "anger issues, which have cost her her job" and barred her return to church. (*Id.* at 680). Ms. Husser reported that Plaintiff "admitted . . . that she has made threatening comments . . . but denies that she would follow through." (*Id.*) In December, Dr. Gibbons noted that she was having trouble paying for needed medications, and her insight was "limited." (*Id.* at 678).

In December 2012, as part of the initial determination on Plaintiff's applications, Psychologist Michael E. Cremerius, Ph.D., reviewed Plaintiff's medical records and determined that her mental impairments did not meet the criteria for any Listing under 20 C.F.R. 404 Subpart P, Appendix 1.[6] (R. at 99–100). He opined that she had moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace, but only mild restrictions in her activities of daily living. (*Id.* at 99). He also found that she had experienced one or two repeated episodes of decompensation of extended duration. (*Id.* at 99).

On March 11, 2013, Plaintiff provided written testimony, stating "My learning disabilities, depression, [and] suicidal thoughts make it extremely difficult for me to obtain a job [and] keep it." (R. at 364). At the same time, she acknowledged that she was able to attend to her own personal care, prepare simple meals, drive a car, handle money, and shop for groceries. (*Id.* at 365–67). She could follow written instruc-

---

[6] Amendments to the regulations, including updated Listings criteria for Mental Impairments, were published on January 18, 2017. *Federal Register,* Vol. 82, No. 11, page 5844–84. https://www.gpo.gov/fdsys/pkg/FR-2017-01-18/pdf/2017-00455.pdf#page=29 Because the amendments apply only to claims filed on or after March 27, 2017, all references to the regulations in this opinion refer to the prior version.

tions but needed to read them more than once due to difficulties with reading. (*Id.* at 369). She also spent time with others on the phone and in person, including at church and at two weight-loss group meetings. (*Id.* at 368).

On March 14, 2013, psychologist Michael E. Stone, Psy.D., evaluated Plaintiff's mental status in connection with Plaintiff's application for benefits. (R. at 689–92). He reviewed Plaintiff's "SSA records and medication management records," but there is no indication that he viewed any of the extensive therapy notes of record or the court-issued No Contact Orders against Plaintiff. (*Id.* at 694). He then inter-viewed Plaintiff, who reported "depression, anxiety, panic attacks, chronic pain, and orthopedic problems." Dr. Stone observed thought content indicative of depression, anxiety, panic attacks, and irritability, and described Plaintiff's affect as "depressed and mildly irritable" with an "anxious, dysthymic, and dysphoric" mood. (*Id.* at 690). He diagnosed "depression secondary to medical problems" and "generalized anxiety disorder with panic attacks." He estimated that her intelligence was in the low av-erage range of intellectual functioning, and opined that her prognosis was "guard-ed." (*Id.* at 692).

That same day, Dr. Stone provided a Medical Source Statement of Ability to Do Work-related Activities. (R. at 698). He adjudged Plaintiff to have no limitations at all in her ability to interact appropriately with supervisors, co-workers, and the public; or to respond to changes in a routine work setting. (*Id.* at 699.) He also opined that Plaintiff had moderate restrictions in her abilities to understand and remember complex instructions, carry out complex instructions, and make judg-

ments on complex work-related decisions. (*Id.*) Her abilities with respect to simple instructions and decisions were only mildly restricted. (*Id.*) She had no other work-related limitations, but, if granted benefits, could not manage the funds in her own best interest. (*Id.* at 699–700).

On March 18, 2013, therapist Annemarie Husser, LCPC, wrote a letter stating that Plaintiff had undergone twelve counseling sessions at the Village of Schaumburg Family Counseling Center since September 2012. (R. at 688). Ms. Husser diagnosed "Major Depressive Disorder, Recurrent, and Unspecified," with borderline functioning and assessed a GAF score of 55. Ms. Husser also made note of Plaintiff's two 2012 hospitalizations, opined that Plaintiff had improved with therapy, and indicated that she was scheduled for continued counseling sessions every two weeks. (*Id.*).

Plaintiff continued to see Ms. Husser for bi-weekly therapy appointments. (R. at 701–20, 769–75). Most of their sessions in 2013 focused on strategies to help Plaintiff address her interpersonal problems, including with her former pastor and friend (*id.* at 701–702, 708), her brothers (*id.* at 703–705), other friends (*id.* at 706, 714), and the leader of one of her weight-loss support groups (*id.* at 710–711, 715). Plaintiff also discussed suicidal thoughts periodically, twice triggered by hearing mention of suicide (*id.* at 709, 716), and once triggered by her weight-loss group leader's repeated suggestion that Plaintiff eat more vegetables (*id.* at 710–11). On that occasion, Plaintiff "reported that she doesn't like it when people tell her what to do, she then gets irritated and may feel suicidal." (*Id.* at 711). Ten months after the No-

Contact Orders were issued, Plaintiff still struggled with her emotions about the conflict with her former pastor and friend, but reported that she needed to wait another year for the Orders to expire before she could contact them to apologize. (*Id.* at 702, 708). She and her therapist also discussed strategies to avoid Plaintiff's pattern of "bottl[ing] up issues and then explod[ing] negatively." (*Id.* at 707, 711).

Plaintiff continued to receive medication management and periodic mental health assessments from the Center. (R. at 721–68). A comprehensive mental health assessment performed by a therapist at the Center on May 2, 2013, listed among Plaintiff's then-current symptoms impulsivity and impulsive behaviors leading to negative consequences, problems which had persisted for more than two years. (*Id.* at 721–723). She was having financial difficulties. (*Id.* at 723). She described the precipitating events for her recent hospitalizations as her use "of the word suicide in front of an officer" and her threats to hurt two people. (*Id.* at 724). She noted that Plaintiff's other health issues included arthritis, high cholesterol, and vision problems. (*Id.* at 731). She reported that her pain was level was 4–5/10 and interfered with her life activities daily. (*Id.* at 732). Her therapist rated her as moderately impaired in four areas of daily living: Health Practices; Communication; Problem Solving; and compliance with Behavior Norms. (*Id.* at 741). Plaintiff stated that she wished to stay out of the hospital. (*Id.*)

In August 2013, Plaintiff's therapist, Ms. Husser, again called the Center to coordinate Plaintiff's care. (*Id.* at 758). The case manager made note of Plaintiff's "tendency to deny having any symptoms at all when we meet for reassessment

and/or treatment planning." (*Id.*) In October 2013, Plaintiff told Dr. Gibbons that she had "thoughts of suicide at times" and was under financial stress. (*Id.* at 759.) In November, Dr. Gibbons noted that she appeared anxious. (*Id.* at 764). In a counseling session on November 5, 2013, Plaintiff told Ms. Husser that when "someone's tone was heightened," it bothered her and caused her to "raise[ ] her voice and say things she doesn't mean." (*Id.* at 718). ). In December 2013, she reported to Ms. Husser that she was "angry" and "wanted to cry" when a man at church "told her to scoot back in the pew so he could pass by." (*Id.* at 720). She described the man as "mean to her" and texted his wife later to say the man had hurt her feelings. (*Id.*). In March 2014, she reported that, the previous month, she thought about how to kill herself by taking an overdose of pills or stabbing herself in the chest. (*Id.* at 773). On April 4, 2014, she and her therapist again discussed how to manage her recurrent irritation with her weight-loss group leader. (*Id.* at 774). On April 28, 2014, she reported that she had recently heard someone discuss suicide but had successfully used techniques learned in therapy to avoid suicidal thoughts. (*Id.* at 775).

At Plaintiff's hearing before the ALJ on May 8, 2014, Plaintiff testified that she completed high school in special education classes. (*Id.* at 51–51). At her last job, as a crossing guard for the Roselle Police Department, she worked just two hours per day, one in the morning and one in the afternoon, on school days only. (*Id.* at 34–35). She was fired from her crossing guard job because of the court orders issued against her after she verbalized thoughts of killing herself, her pastor, and a fellow

parishioner. (*Id.* at 35, 42, 49–50). She affirmed that she was taking Cymbalta and was compliant with her medication at the time of that incident. (*Id.* at 43).

Plaintiff testified that, after losing her job, she received unemployment benefits through December 2013, during which time she applied for cashier jobs. (*Id.* at 38–39). Earlier, sometime before 2000, she had worked as a cashier at 7/11, a job at which she stood all day, but she was fired for being too slow. (*Id.* at 36–37, 53). She did not have conflicts with her colleagues or customers at either job, and did not generate any complaints during her work as a crossing guard. (*Id.* at 37, 40, 50, 53). She believed she could perform a cashier job full-time if she got one, if her knees and her health permitted, and "hoped" she could stay in the job for a long time. (*Id.* at 50). She could drive, grocery shop, cook, wash dishes, and do laundry. (*Id.* at 40). She watched television most of the day, and sometimes went walking with a friend or met for Bible study. (*Id.* at 44, 48). She also attended three group meetings a week: two weight-loss groups (TOPS and Weight Watchers), and church. She admitted that she was bothered by another person at one of the weight-loss groups, but it never got to the point she wanted to "do anything to her." (*Id.* at 44–45). She also had a conflict with a neighbor but the police were not involved. (*Id.* at 47). As to her physical impairments, Plaintiff testified that she had arthritis which caused pain in her right knee. (*Id.* at 45–46).

Psychological expert Terry Shapiro, M.D. also testified. (R. at 55–59). He opined that Plaintiff's impairments caused her no limitations in her activities of daily living; mild limitations in social functioning; and moderate limitations in concentra-

tion, persistence, or pace. (*Id.* at 58–59). He based this opinion in part on Plaintiff's counseling notes and in part on Dr. Stone's finding that Plaintiff had no impairment in social functioning. (*Id.* at 59). Dr. Shapiro also relied on Dr. Stone in assessing Plaintiff with "moderate" restrictions in concentration, persistence, or pace, deriving that assessment from Dr. Stone's findings that Plaintiff was mildly impaired in handling simple instructions and moderately impaired in handling complex instructions. (*Id.* at 59).

Questioned further about the incident with Plaintiff's former pastor and another interpersonal conflict, Dr. Shapiro noted that those "obviously" represented more than mild impairment, "but they seem to be pretty isolated incidents, and it's not documented very well." (R. at 59). Dr. Shapiro opined that Plaintiff's psychiatric hospitalizations were not episodes of decompensation meeting the "C" criteria of the listings. (*Id.* at 60–61). Dr. Shapiro then opined that Plaintiff could perform simple, repetitive tasks with only occasional contact with coworkers, supervisors, or the public. (*Id.* at 62). Questioned further about Plaintiff's suicidal ideation, Dr. Shapiro noted that "complex work situations would not be good for her" but maintained that her problem hearing about suicide "seems to be in the past now" and that she was "better able to deal with people than she had been, given her treatment." (*Id.* at 64). When Plaintiff's lawyer pointed out the two most-recent instances of suicidal thoughts evidenced in the record, as reported to her doctor in October 2013 and her therapist in March 2014, Dr. Shapiro replied "Whoops" then read and summarized the indicated records. (*Id.*) The ALJ then asked the expert to confirm that he had

formulated his opinion based on his review of the records, and that Plaintiff's testimony had not changed his opinion as to the severity of her impairments. (*Id.* at 65.) Dr. Shapiro agreed that was the case, observing, "from testimony, it sounds like the claimant would like to have some kind of part time job, and, you know, work, do some work." (*Id.* at 65–66).

The ALJ also received testimony from a vocational expert (VE), who characterized Plaintiff's past jobs as cashier and crossing guard as unskilled, light exertion work. (R. at 67.) The ALJ then asked whether those jobs could be performed by a person of Plaintiff's age and work experience who was "a high school graduate, with testimony that there was some special education," who could perform work at any exertional level but who was limited to simple and repetitive tasks, with only occasional interactions with the public, coworkers, and supervisors. (*Id.* at 67–68). The VE testified that such a person could not perform either of Plaintiff's past jobs because the tasks required were not "simple." (*Id.* at 68). However, such a person could still perform the light-exertion job of housekeeping cleaner, the medium-exertion job of laundry worker, or the medium-exertion job of transportation cleaner. (*Id.* at 68–69). She would need to remain on task at least 85% of the workday for any competitive position. (*Id.* at 70–71). If such person were to verbalize suicidal ideation at the workplace, her employability would hinge on the "intensity and frequency" of that behavior. (*Id.* at 71–72). If she were to make statements regarding harm to herself or others that (1) caused other people to be off-task at their jobs or (2) constituted a direct threat, that also might affect employability. (*Id.* at 72–74).

# V. DISCUSSION

Plaintiff contends that the ALJ's decision should be reversed because: (1) the ALJ erred in determining Plaintiff's mental RFC; (2) the ALJ erroneously omitted any function-by-function assessment of Plaintiff's physical RFC; and (3) the ALJ erred in assessing the credibility of Plaintiff's claims regarding symptom severity.

## A. The ALJ Erred in Assessing Plaintiff's Mental RFC

In challenging the ALJ's RFC determination, Plaintiff argues, *inter alia,* that the ALJ failed to consider the persistent nature of Plaintiff's mental impairments. The Court agrees.

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young,* 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); Social Security Ruling (SSR) 96–8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or her friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, the ALJ may not dismiss evidence contrary to the ALJ's determination. *Id.; Villano*, 556 F.3d at 563; *see* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR

96–8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

The ALJ began his analysis of the medical evidence with a one-paragraph summary of Plaintiff's mental health treatment history, supported by a single record citation to treatment records comprising 367 pages of the record. (R. at 17) (citing *id.* at 400–664, 668–93, 701–79). He concluded from this brief summary that that "the claimant's treatment notes, consultative report, minimal objective findings, mental status examinations, and activities of daily living" supported the ALJ's finding that Plaintiff's only limitations are to "simple repetitive work with few social demands." (*Id.* at 17). He then finished his analysis of the treatment record with several findings from Plaintiff's May 2012 Mental Assessment at the Center. (*Id.* at 18).

the ALJ's failure to evaluate the bulk of the medical evidence that potentially supported Plaintiff's claim "does not provide much assurance that he adequately considered his case." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006); *c.f. Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."). In particular, the ALJ's summary of Plaintiff's treatment records is troublingly incomplete. Of Plaintiff's hospitalizations, the ALJ wrote, "The claimant also has psychiatric admissions for an exacerbation of symptoms that would last a few days and then she would be discharged in a stable condition." (*Id.* at 17). This does

not adequately describe Plaintiff's history of four hospitalizations totaling 13 nights between October 2011 and August 2012,[7] despite her consistent adherence to a treatment plan of daily medication, biweekly counseling, and periodic comprehensive assessments to manage her conditions. As a result of this omission, the ALJ has not explained how he considered the frequency and duration of Plaintiff's hospitalizations in concluding that she is capable of sustaining regular employment.

The ALJ also ignored a line of evidence from Plaintiff's treatment record that strongly suggests Plaintiff responds negatively to being told what to do. A pastor's repeated urging that she find additional employment caused her to make statements that led to a psychiatric hospitalization, legal action, and the loss of her part-time job. (R. at 49–50, 284–93, 603–04, 672–76, 680). Even relatively innocuous interactions, such as a weight-loss group leader's urging to eat more vegetables or a fellow churchgoer's request that she "scoot back" in a pew to allow him to pass have triggered Plaintiff's symptoms, including anger and suicidal ideation. (*Id.* at 710–11, 720). The Social Security Administration recognizes "the ability to accept instruction and respond appropriately to criticism from supervisors" as a mental ability needed for any job. POMS § DI 25020.010(B)(2);[8] *see Young v. Barnhart,* 362

---

[7] The record also establishes that Plaintiff had two earlier psychiatric hospitalizations in the 13 months immediately preceding the period at issue in this appeal. (R. at 464).

[8] The Program Operations Manual System (POMS) "is a handbook for internal use by employees of the Social Security Administration." *Parker v. Sullivan*, 891 F.2d 185, 189 n.4 (7th Cir.1989). While POMS instructions "are not products of formal rulemaking," *Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffler*, 537 U.S. 371, 385 (2003), and have "no legal force," *Parker*, 891 F.2d at 190, "they nevertheless warrant [the Court's] respect," *Keffler*, 537 U.S. at 385; *see Anderson v. Colvin*, No. 12 CV 3871, 2013 WL 6132705, at *7 (N.D. Ill. Nov. 21, 2013).

F.3d at 1002–03 (remanding where RFC "fail[ed] to account for the evidence" regarding mental limitations including "accepting instruction" and "responding appropriately to criticism from supervisors.") While it is true that the testifying psychiatric expert found that Plaintiff had only "mild" restrictions in social functioning, he also qualified those statements with testimony indicating that some incidents "obviously" reflected more than a mild impairment. The VE, in turn, acknowledged that suicidal statements or statements perceived as threats could disrupt a workplace and affect employability. (R. at 58–59, 71–74). Because the ALJ omitted analysis of this line of relevant evidence, he failed to build the requisite "logical bridge between that evidence and the ultimate determination." *Moon,* 763 F.3d at 721 (citation omitted).

## B. Physical RFC

Plaintiff also takes issue with the ALJ's failure to provide a function-by-function assessment of Plaintiff's physical capacities. In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments." *Villano,* 556 F.3d at 563. Plaintiff suggests that the ALJ should have proffered evidence to support his conclusion that Plaintiff can perform work at all exertion levels.[9] (Dkt. 17 at 8). To the contrary, Plaintiff has the burden of proving that she is disabled and must supply medical evidence to substantiate the existence of her medically-determinable impairments. *Bowen v. Yuckert,* 482 U.S. 137, 146–51 (1987). Though Plaintiff has reported that she has arthritis in both knees, (R. at 45–

---

[9] Despite this finding, the ALJ considered only light- and medium-exertion level jobs for Plaintiff at step five.

46, 731), the medical records she submitted to support her application include no clinical findings, lab test results, X-ray results, or MRI findings that confirm the diagnosis. In the absence of such evidence, the ALJ did not err in finding that Plaintiff does not have a medically-determinable impairment of arthritis. (*Id.* at 17). Plaintiff also asserts that the ALJ should have considered limitations imposed by her high cholesterol, obesity, and allergies, but she points to no evidence that these ailments limit her functioning. In light of the paucity of record evidence as to Plaintiff's physical impairments, the ALJ did not err in omitting a function-by-function assessment of Plaintiff's physical capabilities.

## C. On Remand, the ALJ Should Re-Assess Plaintiff's Credibility

Plaintiff also challenges the ALJ's assessment of her credibility. The Social Security Administration determined recently that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the claimant's] symptoms." SSR 16-3p, at *2. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or

mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3p, at *2.

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft*, 539 F.3d at 678. In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); *see* SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported directly by the medical evidence, the ALJ may not ignore circumstantial evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, 16-3p, like former SSR 96-7p, requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and oth-

er relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 16-3p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Here, the ALJ found that Plaintiff's claims of impairment were "less than fully credible" to the extent they were inconsistent with the RFC assessment and other "factors." (R. at 19). As the first of those factors, the ALJ cited Plaintiff's "own admission as to her ability to perform her past work," as part of her unemployment certifications and during her hearing testimony. It is true that Plaintiff's oral statements, in which she testified that she could perform a cashier job and hoped she could keep it, undercut her written testimony that her impairments made it "extremely difficult" for her to get and keep a job. (R. at 50, 364). It was not improper for the ALJ to consider that conflict in assessing the severity of her impairments. However, the record also contains evidence that Plaintiff is an individual of low cognitive function whose insight into her own conditions is "fair," limited," or "poor." (*Id.* at 427, 636, 640, 642, 644). Other medical records have indicated that she is "a poor historian of her conditions" with an occasional "tendency to deny having any

symptoms at all." (*Id.* at 427, 758). This medical history should caution against taking her own optimistic statements about her abilities at face value. Plaintiff's last cashier job ended approximately 11 years prior to her alleged onset date. (*Id.* at 279, 309). Additionally, VE testimony established that none of Plaintiff's past relevant work could be performed by one limited to "simple" tasks. (*Id.* at 68). In sum, the ALJ must consider Plaintiff's statements in light of the "entire case record," *Arnold,* 473 F.3d at 823, including the evidence that runs contrary to the ALJ's determination, *Craft,* 539 F.3d at 676.

The ALJ also relied on Plaintiff's activities of daily living to discredit her claims of impairment. While it is proper for an ALJ to consider a claimant's daily activities, the Seventh Circuit has repeatedly admonished ALJs not to place "undue weight" on those activities. *Moss,* 555 F.3d at 562; *see Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). Further, when an ALJ does analyze a claimant's daily activities, the analysis "must be done with care." *See Roddy v. Astrue,* 705 F.3d 631, 639 (7th Cir. 2013).

The ALJ correctly noted that Plaintiff's cognitive disorder, depression, and suicidal thoughts do not greatly impair her ability to care for herself. Plaintiff, the ALJ noted, is "able to attend to her personal care needs, watch TV, read, perform household duties, prepare meals, go outside, and go shopping." (R. at 19). The ALJ also relied on Plaintiff's social activities as evidence contradicting her claimed impair-

ments, citing Plaintiff's abilities to spend time with others, talk on the phone, visit family, and go to church. However, as noted above, relatively small conflicts with others have triggered severe psychological and social consequences including suicidal and homicidal ideation, numerous hospitalizations, a job loss, and legal trouble. The ALJ erred in omitting significant evidence about her social limits when weighing the severity of her symptoms.

The other basis for the ALJ's credibility assessment was his conclusion that the "medical evidence of record" does not "fully support" her claims. But because the ALJ omitted any analysis of key portions of that medical record from his opinion, the Court cannot be confident that, in drawing that conclusion, he adequately considered all of the evidence that favors Plaintiff's claim of disability. Therefore, on remand, the ALJ shall reevaluate Plaintiff's symptom severity and RFC, considering all the evidence of record, and shall explain the basis of his findings in accordance with applicable regulations and rulings.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Dkt. 16) is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: April 18, 2017

_____
MARY M. ROWLAND
United States Magistrate Judge